UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ROBERT RHODES, individually and on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>COLUMBIA BANKING SYSTEMS, INC. d/b/a UMPQUA BANK,<br><br>     Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Robert Rhodes, individually and on behalf of all other similarly situated ("Class Members"), brings this Complaint against Defendant Columba Banking Systems, Inc. d/b/a Umpqua Bank ("Umpqua") and alleges the following based on personal knowledge as to his own actions, based on his counsel's investigations, and upon information and belief as to all other matters as follows:

## I.  INTRODUCTION

1.  Plaintiff brings this action against Umpqua for its failure to protect and properly safeguard personally identifiable information ("PII" or "Private Information")[1] including, at a

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 CFR § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive

minimum, Plaintiff's and Class Members' full names and Social Security numbers, along with likely additional information such as their physical addresses, telephone numbers, dates of birth, e-mail addresses, credit scores, and other financial information, and for its failure to timely advise Plaintiff and Class Members that their PII had been compromised.

2.     Umpqua requires its customers, including Plaintiff and Class Members, to provide their private information, including their Social Security numbers as a condition of opening an account. Umpqua's customers therefore entrust it with an extensive amount of their PII.

3.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Umpqua assumed legal and equitable duties to those individuals. Umpqua asserts that it fully understands the importance of protecting such information and claims that safeguarding personal and financial information is a responsibility it takes seriously.

4.     Umpqua retains its customers' PII on computer hardware and shares this PII with various vendors using a file transfer service in the course of outsourcing various banking and marketing services.

5.     On or before June 21, 2023, Umpqua was informed that between May 27 and May 31, 2023 an unauthorized, criminal actor breached one of its vendor's computer networks, thereby gaining access to the PII of 429,252 Umpqua customers that Umpqua had shared with the vendor (the "Data Breach"). Umpqua has revealed that the PII included customers' names, Social Security numbers, and "some" other unspecified personal information. These class members have already suffered injury and ascertainable losses in the form of the present and imminent threat of fraud and identity theft, loss of the benefit of their bargain, out of pocket expenses, loss of value of their time

---

and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).

incurred to remedy or mitigate the effects of the attack, and the loss of, and diminution in value of their PII.

6.    Umpqua waited more than seven weeks before notifying its customers whose PII may have been compromised. And when it did notify its customers, Umpqua underplayed the severity of the data breach and the risk it posed by urging its customers to "continue to bank as you always do." Umpqua apologized for the "inconvenience."

7.    The compromise of Umpqua's customers' PII, and particularly their Social Security Numbers falling into the hands of criminal actors is far more than an "inconvenience." The exposed PII of Plaintiff and Class Members can, and likely will be sold repeatedly on the dark web. Hackers can access and then offer for sale the unencrypted, unredacted PII to other criminals who regularly engage in identity theft, embezzlement, and other financial crimes. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers—which is the type of PII that identity thieves consider the most valuable and which commands the highest price on the dark web.

8.    This PII was compromised due to Umpqua's negligent and/or careless acts and omissions and their respective failure to protect PII of Plaintiff and Class Members and to avoid sharing its members' PII without adequately ensuring that its vendors instituted and maintained adequate safeguards. The security vulnerabilities of the file transfer services Umpqua's vendor used have existed and been known since at least 2021.

9.    Plaintiff and Class Members suffered and will continue to suffer injury due to Defendants' conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to

mitigate the actual consequences of the Data Breach, including but not limited to lost time, and significantly (iv) the continued and certainly an increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's or its vendors' possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II.    PARTIES

10.    Plaintiff is a resident of King County, Washington.

11.    Defendant the company that is the result of a March, 2023 merger between Columbia Banking Systems Inc, which is headquartered in Tacoma, Washington and Umpqua Bank, a Lake Oswego, Oregon based credit union. Following the merger, Columbia and Umpqua do business under the Umpqua Bank brand.

## III.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

13.    This Court has personal jurisdiction over Defendant because it maintains a principal office in this District and does business in and throughout Washington and/or transacted business in Washington for purposes of this lawsuit.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendant's corporate headquarters is located in this District, Plaintiff opened and maintained his

account at a branch located in this District, and, on information and belief, a substantial part of the additional events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

*Background*

15.    Defendant Umpqua has approximately $50 billion in assets and provides banking services out of 340 branches that are located in Washington, Oregon, California, Idaho, Colorado, Arizona, Nevada, and Utah.

16.    Umpqua collected, stored, and granted access to some of Plaintiff's and Class Members' most sensitive and confidential information, including Social Security numbers, home addresses, phone numbers, dates of birth, financial account numbers, and other PII, which is static, does not change, and can be used to commit myriad financial crimes.

17.    Umpqua's members entrust Umpqua with an extensive amount of their PII. Umpqua retains this information on computer hardware and asserts that it understands the importance of protecting such information and claims that safeguarding its customers' personal information is a responsibility it takes seriously.

18.    Plaintiff and Class Members relied on this sophisticated Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand security to safeguard their PII.

19.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Umpqua assumed legal and equitable duties to those individuals.

20.    Umpqua was aware, or should reasonably have been aware, that the PII it collects, stores, and transfers to various vendors for its benefit is highly sensitive and of significant value to those who would use it for wrongful purposes.

21.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[2] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[3]

22.    PII is a valuable commodity to identity thieves once the information has been compromised. As the FTC recognizes, once identity thieves have PII, "they can drain your bank account, run up your credit cards, open new utility accounts, or get treatment on your medical insurance."

23.    Identity thieves can use PII such as the PII of Plaintiff and Class Members which Defendants failed to secure, to perpetrate other varieties of crimes that harm victims. A "cyber black market" exists in which criminals openly post and sell PII. Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals. Plaintiff and Class Members face a lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers.

24.    Professionals tasked with combatting cybercriminals know that PII has real monetary value in part because criminals continue their efforts to obtain this data. In other words, if any additional breach of sensitive data did not have incremental value to criminals,

---

[2] 17 C.F.R. § 248.201 (2013).

[3] *Id.*

a reduction in criminal efforts to obtain such data over time would occur. However, just the opposite has occurred, with data breaches rising

25.     This PII was compromised due to Umpqua's negligent and/or careless acts and omissions and the failure to adequately protect PII of Plaintiff and Class Members and to adequately ensure that its vendors maintained adequate systems to safeguard PII before granting vendors access to Umpqua members' PII.

26.     On its website, Umpqua warns that "[d]ata breaches are now commonplace and cyber-criminals have more access to sensitive information than ever before." Umpqua touts its "ongoing commitment to advances in technology [which] means you can count us to secure your financial information." As such, Umpqua is well aware of the need to protect PII.

27.     Umpqua had a non-delegable duty to protect the PII of Plaintiff and the Class members. Umpqua had an obligation, as to each vendor or company whom it chose to share the PII of Plaintiff and the Class with, to affirmatively ensure that such information would be protected and safeguarded to the same extent as it protects such information internally.

28.     Ransomware is a malware designed by cybercriminals to deny a user or organization access to files on their computer. By encrypting these files and demanding a ransom payment for the decryption key, cybercriminals place organizations in a position where paying the ransom is the easiest and cheapest way to regain access to their files. Some variants have added additional functionality – such as data theft – to provide further incentive for ransomware victims to pay the ransom. Ransomware has quickly become the most prominent and visible type of malware. Umpqua, at all relevant times, knew or should have known that cyber criminals seek out PII, especially through ransomware.

29.    Best practices such as cyber awareness training, continuous data backups, patching, and encryption all exist to prevent ransomware attacks by cybercriminals.

***The Data Breach***

30.    On May 31, 2023, Progress Software Corporation, a company that provides cloud hosting services and secure file transfer services reported a vulnerability in its MOVEit Transfer and MOVEit Cloud software that could lead to escalated privileges and potential unauthorized access to the data being transferred or stored. Progress Software Corp. purportedly launched an investigation, alerted MOVEit customers of the issue and provided mitigation steps. It then purportedly applied additional patches on June 9 and June 16 to purportedly address other vulnerabilities that were discovered. [4]

31.    A Russian cyber gang took responsibility for the cyber-attack, which began on May 27, 2023, and began attempts to exploit data it had accessed. The cyber gang claimed that no data would be released if a ransom was paid and that data stolen from governments and police services had been deleted. On July 17, 2023, that claim was shown to be inaccurate when the group publicly released stolen government information.[5]

32.    On August 15, 2023, Plaintiff received a letter via electronic mail from Umpqua, that stated:

> On Thursday June 22, we shared with you via email that personal information for a segment of Umpqua's customers was accessed due to a third-party vendor's exposure in the global MOVEit Transfer cybersecurity incident. Our investigation has unfortunately revealed that your name and Social Security Number were involved in this incident. No banking information was involved, and you should continue to bank as you always do. We understand this news is frustrating and apologize for the inconvenience.

---

[4] See, https://www.progress.com/security/moveit-transfer-and-moveit-cloud-vulnerability
[5] See, https://www.emsisoft.com/en/blog/44123/unpacking-the-moveit-breach-statistics-and-analysis/

Your relationship with us is very important and safeguarding your personal and financial information is a responsibility we take seriously. We have been working closely with our vendor—who we can now share is Fidelity National Information Services, Inc. (FIS)—to provide 24 months of identity monitoring and theft resolution services to you at no charge.

While we have no evidence at this time that your personal information has been used in an unauthorized way, we are reaching out today to:

Provide an update about what happened.

Inform you to be on the lookout for the official notification letter. This letter will arrive in your mailbox in the coming days. It includes important instructions about how to access your 24 months of identity monitoring and theft resolution services available to you at no charge.

What Happened

On May 31, 2023, Progress Software reported a previously unknown vulnerability in its MOVEit Transfer tool. Thousands of companies, including one of our business partners, FIS, use this file transfer tool to move data files.

FIS is a global financial technology services provider that works with most of the world's leading banks and supports more than one million merchants around the globe. When you buy a coffee, check your balances, or invest in your 401(K), you're likely running on FIS software. Like many banks, Umpqua uses FIS's technology services.

Upon notification, FIS immediately suspended use of the MOVEit Transfer tool, and it remained disabled until they received and implemented a software patch to remediate the issue. FIS also launched an immediate investigation working in partnership with Umpqua and alongside cyber experts and appropriate law enforcement agencies. The investigation has revealed evidence that an unauthorized third party potentially accessed certain files transferred through MOVEit Transfer that contained some of your personal information.

Watch Your Mail

The global MOVEit Transfer cybersecurity incident has led to the unauthorized access of information from millions of people. While we have no evidence at this time that your personal information has been used in an unauthorized way, given the widespread nature of this incident, we highly encourage you to enroll for your no-cost identity monitoring and threat resolution services using the personalized login instructions that will be mailed to you.

Please be on the lookout for a notification letter from Umpqua Bank, which should arrive in the coming days. This letter includes important instructions about how to access your 24 months of identity monitoring and theft resolution services available to you at no charge.

Your notification letter includes contact information for a dedicated support line that you can use to receive assistance setting up your identity monitoring and threat resolution services. For any other questions, please feel free to reach out to your local banker or call us at (866) 486-7782.

In the meantime, please know that we take this matter very seriously, and we sincerely apologize again for any concern and inconvenience this may cause you.

33.    Umpqua's notice downplayed its failure to adequately ensure that its vendors employed adequate security in keeping with the priorities Umpqua claimed to place on cyber security. It further downplayed the potential risks this data breach posed to its customers by urging customers to continue to bank as they always do. Umpqua's notice was additionally misleading in that it claimed the vulnerability in the data transfer tool was unknown prior to May 31, 2023. In fact, the vulnerability that allowed the cyber criminals to gain access to PII through the file transfer software have existed since 2021 and similar vulnerabilities that were exploited by the same cyber criminals have been identified at least that far back.[6]

34.    Umpqua claimed that in response to the Data Breach, it "took immediate measures to protect member information." Yet the only measure it identifies taking was temporarily suspending services with the vendor. Such measures were ineffectual as the PII the Umpqua had a duty to safeguard had already been released.

---

[6] See Bill Toulas, Fortra Shares Findings on GoAnywher MFT Zero-Day Attacks, BleepingComputer (Apr. 19, 2023), https://www.bleepingcomputer.com/news/security/fortra-shares-findings-on-goanywhere-mft-zero-dayattacks/; see also Ionut Ilascu, Global Accellion Data Breaches Linked to Clop Ransomware Gang, BleepingComputer (Feb. 22, 2021), https://www.bleepingcomputer.com/news/security/global-accellion-databreaches-linked-to-clop-ransomware-gang/.

35.    Umpqua has not shared with Plaintiff or with Class Members which vendor or vendors had been breached, whether similar vulnerabilities exist at other vendors with whom Umpqua shares its members' PII, and what, if any, remedial measures it and its vendors have undertaken to ensure a breach does not occur again. Plaintiff and Class Members retain a vested interest in ensuring that their information remains protected.

36.    Plaintiff and Class Members' unencrypted information may, and likely will end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

37.    Umpqua did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiff and for Class Members, causing their PII to be exposed.

*Umpqua is Entrusted with Plaintiff's and Class Members' PII.*

38.    As a condition of providing services to its customers, Umpqua requires that its customers entrust Umpqua with highly confidential PII including their home and business addresses, telephone numbers, e-mail addresses, Social Security numbers, and dates of birth. As a credit union that maintains bank accounts, mortgages, and various other financial products and services, it obviously develops and maintains sensitive financial information on behalf of its customers.

39.    By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Umpqua assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

40.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Umpqua to keep their PII confidential and securely maintained, to use this information for business purposes only, to adequately ensure that any third party vendors maintained adequate procedures and safeguards to keep the PII Umpqua provided confidential, and to make only authorized disclosures of this information.

### *Securing PII and Preventing Breaches.*

41.     Umpqua could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiff and Class Members and by determining that all of its vendors, properly secured and encrypted such information.

42.     Umpqua's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

43.     Despite the prevalence of public announcements of data breach and data security compromises, Umpqua failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

44.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### *Value of Personal Identifiable Information*

45.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200,

and bank details have a price range of $50 to $200.[7] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[8] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[9]

46.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[10]

47.    Changing or canceling a stolen Social Security number is a difficult task. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted because an individual must show evidence of

---

[7] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed August 1, 2022).

[8] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at:* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed August 1, 2022).

[9] *In the Dark*, VPNOverview, 2019, *available at:* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed August 1, 2022).

[10] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed August 1, 2022).

actual, ongoing fraud activity to obtain a new Social Security number.

48.     Moreover, a new Social Security number may not be an effective remedy to an identity theft. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[11]

49.     Based on the foregoing, the information compromised in Umpqua's Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and it is difficult, if not impossible, to change.

50.     This data that Umpqua failed to safeguard demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[12]

51.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

---

[11] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last accessed August 1, 2022).

[12] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed August 1, 2022).

52.     The PII of Plaintiff and Class Members was likely taken by hackers to engage in identity theft or and or to sell it to other criminals who will purchase the PII for that purpose. The fraudulent activity resulting from Umpqua's Data Breach may not come to light for years.

53.     There may also be a time lag between when harm occurs versus when it is discovered and also between the time PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[13]

54.     At all relevant times, Umpqua knew, or reasonably should have known, the importance of safeguarding Plaintiff's and Class Members' PII and of the foreseeable consequences that would occur if the PII was compromised, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members.

55.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

56.     To date, Umpqua has offered Plaintiff and Class Members only two years of identity monitoring through a single provider. This is inadequate to protect Plaintiff and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

57.     The injuries to Plaintiff and Class Members were directly and proximately caused by Umpqua's failure to implement or maintain adequate data security measures for the PII of

---

[13] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/products/gao-07-737 (last accessed August 1, 2022).

Plaintiff and Class Members when releasing that PII to third party vendors.

### *Plaintiff Robert Rhodes' Experience*

58.    Mr. Rhodes opened a business checking account at an Umpqua branch in Seattle, Washington in late 2021 and opened a personal checking account a few months later at the same branch. He specifically sought a smaller and more consumer-friendly institution. He was, however, wary of banking at a small credit union that may not have sufficiently sophisticated safeguards to protect his sensitive information. He chose Umpqua in part, based on Umpqua's assurances regarding its level of sophistication and its commitment to keeping sensitive information secure.

59.    As a condition of opening accounts at Umpqua, Mr. Rhodes was required to provide detailed PII that included his address, telephone number, email address, Social Security number, date of birth, business tax identification number, and driver's license number. Umpqua stored and/or shared some of Mr. Rhodes's most sensitive (and extremely valuable to cyber criminals and identity thieves) PII resulting in the exposure of Mr. Rhodes's PII during the Data Breach.

60.    As a result of learning of the Data Breach, Mr. Rhodes has spent, and is continuing to spend, time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach, at least two hours exploring credit monitoring and identity theft insurance options, and self-monitoring his financial accounts. This time has been lost and cannot be recaptured.

61.    Mr. Rhodes is careful about sharing his PII. He has not knowingly transmitted unencrypted PII over the internet or any other unsecured source, and stores documents containing his PII in a secure location or destroys the documents.

62.    Mr. Rhodes suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Mr. Rhodes entrusted to Umpqua as a customer, which was compromised in and as a result of the Data Breach.

63.    Mr. Rhodes has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety, distress, and increased concerns for the loss of his privacy.

64.    Mr. Rhodes has suffered injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name and/or other identifying information being placed in the hands of unauthorized parties and possibly criminals.

65.    Since June 2023 Mr. Rhodes has received an increased amount of suspicious and outright fraudulent messages regarding various accounts and assets he holds. For example, he has received no fewer than 10 notices that specific transactions were made on his PayPal account when in fact, they were not. On July 29 and 30, 2023, he was cyber-attacked and received more than 30 emails in less than 24 hours with notices purporting to be from various financial institutions. He has further been contacted by callers purporting to represent  accounts he has never held or purporting to be from government agencies seeking information from him.

66.    Upon receiving notice of this data breach, Mr. Rhodes researched the "OnAlert" identity theft protection service offered in Umpqua's notice. He found that this free service is not considered sufficiently robust or effective. He promptly enrolled in a more comprehensive and highly regarded identity theft protection service with an annual fee in excess of $100. He has also paid an Information Technology consultant to enhance his internet security.

67.     Mr. Rhodes has a continuing interest in ensuring that his PII, which remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V.    CLASS ALLEGATIONS

68.     Plaintiff brings this action as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed Class and Class, under CR 23(a), 23(b)(2) and 23(b)(3).

69.     The proposed Class is defined as:

> All persons whose personally identifiable information Umpqua held and/or transferred to another party and which was exposed to an unauthorized party as the result of the data breach referenced in Umpqua's correspondence of August 15, 2023 to Plaintiff Rhodes.

Plaintiff reserves the right to modify, change, or expand the Class definition, including proposing subclass, based on discovery and further investigation.

70.     Excluded from the Class are Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

71.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence that would be used to prove those elements in individual actions alleging the same claims.

72.     <u>Numerosity</u>. The members of both the Class and the Class are so numerous that a joinder of all members would be impracticable. Defendant Umpqua has stated that 429,252 of its

customers had their PII compromised in the Data Breach and who would be members of the proposed class.

73.    <u>Commonality and Predominance</u> (CR 23(a)(2) and CR 23(b)(3)). There are numerous questions of law and fact common to Plaintiff and members of the Class. Those common questions of law or fact predominate over questions that may affect only individual Class members. The common issues arising from Umpqua's conduct predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. The questions of law and fact common to Plaintiff and members of the Class include, among others, the following:

a.    Whether and to what extent each Defendant had a duty to protect the PII of Plaintiff and Class Members;

b.    Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

c.    Whether Defendant failed to properly review, assess, and manage the cybersecurity risk posed by allowing third party vendors and service providers access to Plaintiff's and Class Members' Private Information;

d.    When Defendant actually learned of the Data Breach;

e.    Whether Umpqua adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

f.    Whether Umpqua violated applicable law by failing to promptly, accurately, or adequately notify Plaintiff and Class Members that their PII had been compromised;

       g.     Whether Umpqua failed to implement and maintain sufficient security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

       h.     Whether Umpqua took adequate steps to ensure that its vendors had enacted and maintained sufficient security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

       i.     Whether Umpqua adequately addressed and ensured that the vulnerabilities that permitted the Data Breach to occur had been fixed;

       j.     Whether Umpqua created and then breached implied contracts with class members;

       k.     Whether Umpqua engaged in unfair or deceptive practices by misrepresenting its level of security and/or by failing to safeguard the Private Information of Plaintiff and Class Members;

       l.     Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

       m.     Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced because of the Data Breach.

74.     <u>Typicality</u>. CR 23(a)(3): Plaintiff's claims are typical of the claims of all Class Members in that the PII of the representative Plaintiff, like that of all Class Members, was compromised in the Data Breach. The evidence and legal theories regarding Umpqua's alleged failings are substantially the same for Plaintiff and all the Class Members.

75.     <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was maintained

and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. Defendant's policies and conduct challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

76.    Adequacy. CR 23(a)(4): Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained capable and competent attorneys who have significant experience in complex and class action litigation, including consumer rights litigation. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have interests that are contrary to or that conflict with those of the Class.

77.    Superiority. CR 23(b)(3): Plaintiff and Class Members have suffered and will continue to suffer harm and damages as a result of Defendants' conduct. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitive. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. There will be no significant difficulty in the management of this case as a class action. The members of the Class are readily identifiable from Umpqua's records.

78.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would

necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

79. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, including its privacy policy, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

80. Adequate notice can be given to Class Members directly using information maintained in Defendant's records. Unless a Class-wide injunction is issued, Defendants may continue in its failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Petition.

81. Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

**VI.    CLAIMS**

**First Cause of Action**

**Negligence**

82. Plaintiff incorporates the above allegations as if fully set forth here.

22

83.    As a condition of opening and maintaining accounts at Umpqua, Umpqua's current and former customers were obligated to provide Umpqua with certain PII, including their names, Social Security numbers, home addresses, telephone numbers, and dates of birth.

84.    Plaintiff and Class Members entrusted their PII to Umpqua on the premise that Umpqua would safeguard their information, including when sharing their information with third party vendors, and/or not allow their PII to be disclosed to unauthorized third parties.

85.    Umpqua has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed. Umpqua knew or should have known that Plaintiff's and the Class's sensitive PII was an attractive target to cyber thieves.

86.    Umpqua knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the negligence of a vendor or the criminal acts of a third party.

87.    Umpqua had a non-delegable duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing both its own, and its authorized vendors' security protocols to ensure that the PII of Plaintiff and the Class that was in Defendant's possession was adequately secured and protected.

88.    Umpqua's duty to use reasonable security measures arose as a result of the special relationship that existed between Umpqua and its customers—including Plaintiff and each Class Member. That special relationship arose because Plaintiff and the Class Members entrusted Umpqua with their confidential PII, a necessary part of being its customers.

23

89.    Defendant was subject to an "independent duty," untethered to any contract between Umpqua and Plaintiff or the Class.

90.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's and/or its vendors' inadequate security practices.

91.    Umpqua is liable as the principal for the conduct of its vendors that acted as its agent and who were given access to Plaintiff's and Class Members' PII in the course of that agency relationship.

92.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting, storing, and sharing the PII of Plaintiff and the Class and Class, along with the critical importance of ensuring adequate security of that PII at all times.

93.    Defendant had the ability to sufficiently guard against data breaches. Defendant's own conduct created a foreseeable risk of harm to Plaintiff and the Class. Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiff and the Class and Class in the face of increased risk of theft.

94.    Defendant breached its duty to exercise reasonable care in protecting Plaintiff's and the Class Members' PII by failing to take reasonable security measures, and by ensuring that its vendors took reasonable security measures, to safeguard and adequately secure the PII of Plaintiff and the Class Members from unauthorized access.

95.    Under RCW 19.255.010(1), Umpqua also owed a duty to timely disclose to Plaintiff and to the Class Members that their PII had been, or was reasonably believed to have been,

compromised. Timely disclosure was necessary so that Plaintiff and the Class Members could take measures to promptly take steps to protect themselves and their assets from identity theft.

96.     Umpqua breached its duty to timely disclose the Data Breach to Plaintiff and the Class Members. After learning of the Data Breach, Umpqua unnecessarily delayed notifying Plaintiff and Class Members in a sufficiently conspicuous manner.

97.     Umpqua has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

98.     But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

99.     There is a causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

100.     As a direct and proximate result of Defendant's, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's

possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiff and the Class; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class.

101.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

### Second Cause of Action

### Breach of Contract

102.    Plaintiff incorporates the above allegations as if fully set forth here.

103.    Each Class Member's account with Umpqua was governed by Umpqua's document entitled *Personal Rules and Regulations; General Procedures and Disclosures*.

104.    This document, which Umpqua drafted and which was uniformly imposed on each Class Member governed the relationship between Umpqua and each Class member and constitutes a contract.

105.    The contract sets forth when and how Umpqua may disclose information about each Class Member's account, including their PII by stating:

> We will disclose information to third parties about your Account or the transfers you make:
>
> • Where it is necessary for completing transfers;
> • In order to verify the existence and condition of your Account for a third party,
> such as a credit bureau or merchant;
> • In order to comply with government agency or court orders; or
> • As explained in the separate Privacy Policy.

106.    The referenced Privacy Policy, in turn, states

> In the course of business, we may disclose personal information to third parties, service providers, or contractors for the business purposes stated in our notice, such as to deliver products, services and content to you or to improve or enhance your experience with us.

107.    The Privacy Policy further states:

> We use reasonable physical, electronic, and procedural safeguards that comply with federal standards to protect and limit access to personal information. This includes device safeguards and secured files and buildings.

108.    Neither Umpqua's contract nor its incorporated Privacy Policy allows the disclosure of Personal Information to unauthorized parties such as cyber criminals. Umpqua breached its contract with Plaintiff and with each Class Member by allowing the disclosure of PII to unauthorized parties who were not legitimate service providers or contractors for business purposes.

109.    Umpqua breached its contract with Plaintiff and with each Class Member by failing to sue and ensure sufficient procedural safeguards to protect personal information.

110.    As a direct and proximate result of Umpqua's above-described breach, Plaintiff and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports;

expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

### Third Cause of Action

**Breach of Implied Contract**

**(pled in the alternative to Second Cause of Action)**

111.    Plaintiff incorporates the above allegations as if fully set forth here.

112.    Umpqua required Plaintiff and Class Members to provide their personal information, including names, Social Security numbers, home addresses, phone numbers, dates of birth, and other personal information, as a condition of being customers of Umpqua.

113.    As a condition of being customers of Umpqua, Plaintiff and the Class Members each provided their personal and financial information. In so doing, Plaintiff and the Class Members each entered into implied contracts with Umpqua by which Umpqua agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class Members if their data had been breached and compromised or stolen.

114.    Plaintiff and the Class fully performed their obligations under the implied contracts with Umpqua.

115.    Umpqua breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal and financial information and by failing to provide timely and accurate notice to them that personal and financial information was compromised as a result of the Data Breach.

116.    As a direct and proximate result of Umpqua's above-described breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in

monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

### Fourth Cause of Action

### Negligence Per Se

117.    Plaintiff incorporates the above allegations as if fully set forth here.

118.    Pursuant to Federal Trade Commission, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

119.    Defendant breached its duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

120.    Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

121.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

122.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

123.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are at a current and ongoing risk of identity theft, and Plaintiff and Class Members sustained compensatory damages including: (i) invasion of privacy; (ii) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iv) financial "out-of-pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) diminution of value of their Private Information; (viii) future costs of identity theft monitoring; (ix) anxiety, annoyance and nuisance, and (x) the continued risk to their Private Information, which remains in Defendant's control, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

124.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

125.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future periodic audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### Fifth Cause of Action

**Washington Consumer Protection Act**

**RCW 19.86,** *et seq***.**

126.    Plaintiff incorporates the above allegations as if fully set forth here.

127.   Umpqua is a person within the meaning of the Washington Consumer Protection Act, RCW 19.86.010 and it conducts "trade" and "commerce" within the meaning of RCW 19.86.010(2).

128.   Plaintiff and the Class members are "persons" within the meaning of RCW 19.86.010(1).

129.   Umpqua engaged in unfair or deceptive acts or practices in the conduct of its business by the conduct set forth above. These unfair or deceptive acts or practices include: failing to adequately secure Plaintiff's and the Class members' sensitive personal information from disclosure to unauthorized third parties or for improper purposes; enabling the disclosure of personal and sensitive facts about Plaintiff and the Class members in a manner highly offensive to a reasonable person; enabling the disclosure of personal and sensitive facts about Plaintiff and the Class members without their informed, voluntary, affirmative, and clear consent; and omitting, suppressing, and concealing the material fact that Defendant did not reasonably or adequately secure Plaintiff's and the Class members' sensitive personal information.

130.   Umpqua's systematic acts or practices are unfair because they (1) caused substantial financial injury to Plaintiff and the Class members; (2) are not outweighed by any countervailing benefits to consumers or competitors; and (3) are not reasonably avoidable by consumers.

131.   Umpqua's systematic acts or practices are unfair because the acts or practices are immoral, unethical, oppressive, and/or unscrupulous.

132.    Umpqua's systematic acts are deceptive as its actual practices and omissions compared with its representations regarding its emphasis on keeping sensitive information secure were and are capable of deceiving a substantial portion of the public.

133.    Umpqua's unfair or deceptive acts or practices have occurred in trade or commerce within the meaning of RCW 19.86.010 and RCW 19.86.020 and are ongoing and/or have a substantial likelihood of being repeated.

134.    Umpqua's unfair or deceptive acts or practices impact the public interest.

135.    As a direct and proximate result of Umpqua's unfair or deceptive acts or practices, Plaintiff and the Class members have suffered injury in fact.

136.    As a result of Umpqua's conduct, Plaintiff and the Class members have suffered actual damages including from fraud and identity theft, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased and imminent risk of fraud and identity theft, the lost value of their personal information, and other economic and non-economic harm.

137.    Plaintiff and the Class members are therefore entitled to legal relief against Umpqua, including recovery of nominal damages, actual damages, treble damages, injunctive relief, attorneys' fees and costs, and such further relief as the Court may deem proper.

### Sixth Cause of Action
#### Declaratory and Injunctive Relief

138.    Plaintiff incorporates the above allegations as if fully set forth here.

139.    Plaintiff pursues this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

140.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is

141.    authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

142.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' Private Information, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that further compromises of their Private Information will occur in the future.

143.    The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect Plaintiff's and Class Members' Private Information.

144.    Defendant still controls the Private Information of Plaintiff and the Class Members.

145.    To Plaintiff's knowledge, Defendant has made no announcement that it has changed its data or security practices relating to the Private Information.

146.    To Plaintiff's knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

147.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Umpqua or one of its vendors. The risk of another such breach is real, immediate, and substantial.

148.    As described above, actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class members are at risk of additional or further harm due to the exposure of their Private Information and Defendant's failure to address the security failings that led to such exposure.

149.    There is no reason to believe that Defendant's employee training and security measures are any more adequate now than they were before the breach to meet Defendant's contractual obligations and legal duties.

150.    The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at or affecting Umpqua, Plaintiff and Class Members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

151.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach that effects Umpqua, thus eliminating the additional injuries that would result to Plaintiff and Class.

152.    Plaintiff and Class Members seek a declaration (i) that Defendant's existing data security measures do not comply with its contractual obligations and duties of care to provide adequate data security; and (ii) that to comply with its contractual obligations and

duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

a. engage internal security personnel to conduct testing, including audits on Defendant's systems, and the systems of each vendor with whom Defendant shares its customers' PII on a periodic basis, and promptly correct any problems or issues detected by such third-party security auditors;

b. engage third-party security auditors and internal personnel to run automated security monitoring;

c. audit, test, and train its security personnel and employees regarding any new or modified data security policies and procedures;

d. purge, delete, and destroy, in a reasonably secure manner, any Private Information not necessary for its provision of services;

e. conduct regular database scanning and security checks; and

f. routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information, including but not limited to, PII.

### VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for an order:

a.    Certifying this case as a class action, appointing Plaintiff as Class representative, and appointing Plaintiff's counsel to represent the Class;

b.    Entering judgment for Plaintiff and the Class;

c.    Awarding Plaintiff and Class Members monetary relief;

d.    Ordering appropriate injunctive relief as outlined above;

e.    Awarding pre and post judgment interest as prescribed by law;

f.    Awarding reasonable attorneys' fees and costs as permitted by law; and

g.    Granting such further relief as may be just and proper.

Plaintiff further demands trial by jury.

Dated this 18th day of August, 2023.

LAW OFFICE OF ARI BROWN

_____

By:
    Ari Y. Brown, WSBA #29570
    Email: abrownesq@gmail.com
    3909 47th Ave. South
    Seattle, WA 98118
    Telephone: (206) 412-9320

HEENAN & COOK

John Heenan, (*Pro Hae Vice* forthcoming )
Email: john@lawmontana.com
Billings, Montana 59102
Telephone: (406) 839-9081